IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| Plaintiff, § | |
| § | Criminal No. 3:12-CR-146-D |
| VS. § | |
| § | |
| BRANDON SHAW, § | |
| § | |
| Defendant. § | |

MEMORANDUM OPINION
AND ORDER

Defendant Brandon Shaw ("Shaw")—charged with the offense of possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)—moves to suppress the firearm seized from his automobile on January 21, 2012, and any other evidence obtained from that warrantless search. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On January 21, 2012 Dallas Police Department ("DPD") officer Daniel Torres ("Officer Torres"), a member of the DPD Gang Unit, was working for two weeks as a patrol officer as part of a DPD initiative. He and his partner, Officer Irwin, were patrolling a high crime area in a marked squad car. Officer Torres initiated a traffic stop of defendant Shaw's

---

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

BMW after observing Shaw exit the parking lot of a hotel and turn without signaling.[2]

As Officers Torres and Irwin approached Shaw's vehicle from the rear, Officer Torres observed Shaw making furtive gestures between his seat and the center console. Officer Torres was concerned for officer safety because Shaw could be hiding a weapon, and that Shaw might possess contraband, so he ordered Shaw to exit his vehicle. Officer Torres patted Shaw down and asked him whether he had weapons or drugs in his possession. Shaw said he did not.

Officer Torres detained Shaw in the back of his squad car while he ran a computer check for outstanding warrants. After learning that there were outstanding traffic warrants for which Shaw could be arrested, Officer Torres decided to arrest Shaw and transport him to jail. The length of the detention was no longer than necessary to run the computer check and place Shaw under arrest.[3]

Before departing for the jail, Officer Torres asked Shaw whether his vehicle could be released to a female who was present at the scene.[4] Shaw responded, "No." Because Shaw

---

[2]Officer Torres also testified that Shaw committed a traffic violation by making a wide turn into a second lane of traffic.

[3]Officer Torres testified that Shaw was handcuffed within ten minutes after the traffic stop was initiated. The court need not determine whether this testimony is accurate because the court finds that Shaw was detained only so long as was necessary to run the computer check, and was then promptly arrested once the check revealed outstanding warrants for which Shaw could be arrested.

[4]Officer Torres testified that the female—who turned out to be Shaw's cousin, Dakendria Wheeler ("Wheeler")—was a passenger in Shaw's BMW. Wheeler testified that she was driving her own vehicle. The court need not resolve this dispute in the testimony because Wheeler testified that she exited her vehicle and walked to the scene of the traffic

declined to release his vehicle to the custody of another person, it was necessary under DPD policy for the vehicle to be towed from the scene and impounded. DPD policy also provides in such circumstances that an inventory search of the vehicle be conducted. Had Shaw agreed to release his vehicle to the custody of the female, there would have been no need to conduct an inventory search.

Torres began searching Shaw's vehicle, looking at where he had reached and could reach. Torres found clothing and a tablet computer,[5] but did not find any contraband.

At this point in time, DPD Officers Jason Trahan ("Officer Trahan") and Francis, who had been driving through the area in their squad car, observed the traffic stop and decided to stop and act as a cover element for Officers Torres and Irwin. Upon arriving, Officer Trahan offered as a favor to Officer Torres to wait for the wrecker to arrive and to complete the inventory sheet while Officer Torres took Shaw to jail. It is common for DPD officers to do this for each other because it speeds up the process by enabling the arresting officer to take the arrestee to jail without awaiting the arrival of the wrecker for the vehicle that is to be impounded.

After Officer Torres departed with Shaw for the jail, Officer Trahan conducted an inventory of Shaw's vehicle. Officer Trahan did not know whether Officer Torres had

---

stop after it was made, and DPD Officer Jason Trahan testified that he observed a female already at the scene when he arrived.

[5]The evidence in the record refers to an Apple iPad or tablet. The court will refer throughout to a "computer tablet."

performed an inventory search. Officer Torres told him he had looked in the car, and Officer Trahan thought he might have interrupted Officer Torres' inventory search. But Officer Trahan always takes a second look when he is the officer awaiting the wrecker because he believes he will be the one who is in trouble if property is missed. Officer Torres also testified that it is DPD policy for an officer to conduct a second inventory search when that officer is left in charge to handle the impoundment of a vehicle, rather than to rely on the search conducted by another officer.

During Officer Trahan's search of Shaw's vehicle he found a loaded Glock pistol located between the driver seat and the center console. He checked by radio to determine whether the firearm was stolen, and he learned that it was. He seized the firearm, and it is the subject of the indictment against Shaw.

According to Officer Trahan, Officer Torres' name and badge number are shown on the DPD impounded vehicle receipt ("Vehicle Receipt") because it was his arrest, even though Officer Trahan completed the document. The only item Officer Trahan circled in the place on the Vehicle Receipt for identifying "PROPERTY INSIDE THE VEHICLE" was "CLOTHING." He did not circle "GUN" or "COMPUTER" because these items were removed from Shaw's vehicle and placed in the DPD property room. Officer Trahan was not trained to list an item that was not being left in the vehicle. DPD wants valuable property placed in the property room, not left in a vehicle in the impoundment yard. Under this policy, Officer Trahan considered it okay to leave clothing in Shaw's vehicle.

As set forth in Shaw's closing argument at the hearing, he moves on three grounds to

suppress the firearm and any other evidence discovered as a result of the search of his vehicle: (1) the police lacked probable cause to stop his vehicle; (2) the length of his detention following the stop was unreasonable, and the detention exceeded the scope of the initial justification for the traffic stop; and (3) the searches of his vehicle were not permissible either as a search incident to an arrest or as an inventory search.

II

A

Shaw contends that the police lacked probable cause to stop his vehicle. He maintains that, because the police report merely stated that he made an "improper turn" and did not mention, *inter alia*, his failure to signal before turning, there was inadequate legal justification to support probable cause for the stop. Shaw relies on *United States v. Miller*, 146 F.3d 274 (5th Cir. 1998), to contend that it was necessary for the police report in his case to state on its face a traffic violation, and that testimony at a suppression hearing must be deemed insufficient to remedy a police report that is deficient; otherwise, a police officer could always offer testimony at a suppression hearing to justify a traffic stop.

B

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Miller*, 146 F.3d at 277 (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). The court holds that the government has established by a preponderance of the evidence that the police had probable

cause to effect the stop of Shaw's vehicle.[6] Officer Torres observed Shaw turn without signaling, in violation of Tex. Transp. Code Ann. § 545.104 (West 2011), which prohibits, *inter alia*, turning without using a turn signal.

The court rejects Shaw's interpretation of *Miller* and his contention that the government is limited to the basis for the stop—"improper turn"—set out in the police report. In *Miller* the court held there was no probable cause to justify a traffic stop because the officer's reason for effecting the stop—the defendant's failure to turn after signaling an intent to turn—was not, in fact, a violation of Texas law. *See Miller*, 146 F.3d at 278. *Miller* does not hold that the government is confined to the traffic violation specified in a police report. And although such evidence may persuade the court as trier of fact to disbelieve an officer's contrary testimony at a suppression hearing, the officer is entitled to testify to a basis for probable cause that is not contained in a contemporaneous police report.

Nor does *Miller* support Shaw's position otherwise. Unlike the basis on which police relied in *Miller*, in this case Shaw's failure to signal before turning *is* a violation of Texas law. *See* Tex. Transp. Code Ann. § 545.104. Officer Torres testified credibly that, when Shaw exited the hotel parking lot, he made a wide turn (i.e., did not turn into the immediate lane) and did not activate his turn signal, which is consistent with the police report's notation of an "improper turn." Because Shaw's failure to signal his intention to turn violated Texas

---

[6]The government bears the burden of proving at a suppression hearing by a preponderance of the evidence that the Fourth Amendment has not been violated. *United States v. Matlock*, 415 U.S. 164, 177-78 n.14 (1974).

law, Officer Torres had probable cause to effect the traffic stop.

III

A

Shaw maintains that the length of his detention following the stop was unreasonable, and the detention exceeded the scope of the initial justification for the traffic stop.[7] He contends that the detention was unlawfully extended and that the officers' actions —including questioning about possession of drugs or guns, the immediate pat-down, his seizure pending a criminal background check, and multiple searches—were not reasonably related to the reason Shaw was initially stopped: the resolution of a traffic violation for an alleged "improper turn."

B

Courts examine the legality of traffic stops under the two-pronged analysis described in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *See United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). "Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (citing *Terry*, 392 U.S. at 19-20). Under the second prong, the issue is whether the officer's actions "were reasonably

---

[7]In his closing argument at the suppression hearing, Shaw stated that he is relying on analysis contained in his motion that is based on *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (en banc). The court therefore addresses what it understands to be Shaw's reasoning as set forth at pages 6-7 of his motion. Included in this reasoning is the contention that the stop was not justified at its inception. This contention fails for the reasons explained *supra* at § II.

related to the circumstances that justified the stop, *or to dispelling his reasonable suspicion developed during the stop.*" *Id.* at 507 (emphasis added).

The court has already held that the stop of Shaw's vehicle was justified at its inception. *See supra* § II. The court now concludes that Officer Torres' actions satisfied the second prong of the test. After stopping Shaw's vehicle, Officer Torres observed Shaw making furtive gestures. He ordered Shaw to exit his vehicle because he was concerned for officer safety because Shaw could be hiding a weapon. Officer Torres conducted the pat down only after Shaw engaged in conduct that gave him concern for officer safety; he did not do so based merely on having observed a traffic offense.

Officer Torres' questioning of Shaw about whether he possessed drugs or guns did not violate the Fourth Amendment. *See Brigham*, 382 F.3d at 508 ("We reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation." (internal quotation marks, emphasis, and citation omitted)).

Nor did Officer Torres violate Shaw's Fourth Amendment rights by detaining him pending receipt of the background check. "Although a traffic stop must be no longer than necessary to effectuate its purpose, the officer may ask questions and 'request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check on both.'" *United States v. Daniels*, 265 Fed. Appx. 219, 222 (5th Cir. 2008) (per curiam) (quoting *Brigham*, 382 F.3d at 507-08).

The officers' actions in searching Shaw's vehicle were constitutional, as the court

explains below, under the inventory search exception. *See infra* § IV.

And the length of Shaw's detention following the traffic stop was reasonable because it lasted only until Officer Torres concluded the computer record check, at which time Shaw was arrested.

IV

Finally, Shaw contends that the searches of his vehicle were not valid either as searches incident to an arrest or as inventory searches. The government does not now rely on the premise that the firearm was found during a search incident to arrest.[8] The court will address whether the government has proved that the firearm was found during a lawful inventory search.

A

Shaw maintains that the search of his vehicle conducted by Officers Trahan and Francis was unreasonable and not performed according to DPD Standard Operating Procedures. He posits that, if Officer Torres conducted an inventory search that followed standard operating procedures, the search that Officers Trahan and Francis conducted was an additional inventory search that was not authorized under DPD Standard Operating Procedures, which only provide that "*an* inventory search will be conducted prior to the vehicle being towed." D. Mot. 10 (emphasis in original). Shaw maintains that the second

---

[8]The police report stated that the search was a search incident to arrest, but Officer Torres explained that this description was a mistake, and the government does not rely on this basis to justify the warrantless search. The government maintains that Officers Torres' and Trahan's searches were valid inventory searches.

- 9 -

inventory search conducted by Officers Trahan and Francis was therefore a purposeful and general means of discovering evidence of a crime that, when viewed from an objective standpoint, was conducted solely with evidentiary motivation. Shaw contends that the officers' classification of the second search as a cross between a search incident to arrest and a routine inventory search demonstrates that the second search was nothing more than a bad-faith pretext for a general evidentiary search of his vehicle looking for incriminating evidence. In his closing argument, Shaw contended that Officer Torres originally justified the search as a search incident to arrest, when it was not such a search and is not now asserted to be one; that the search cannot qualify as an inventory search if it is a search for evidence; and that the search conducted by Officer Trahan was not an inventory search.

B

"[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). An inventory search

> is reasonable and not violative of the Fourth Amendment if it is conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger.

*United States v. McKinnon*, 681 F.3d 203, 209 (5th Cir. 2012) (quoting *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999)). The standardized procedures "must sufficiently limit the discretion of law enforcement officers to prevent inventory searches from becoming

evidentiary searches." *Id.* at 210 (quoting *United States v. Andrews*, 22 F.3d 1328, 1336 (5th Cir. 1994)). The procedures can allow "the exercise of judgment based on concerns related to the purposes of an inventory search," such as whether to open a container. *Florida v. Wells*, 495 U.S. 1, 4 (1990). But officers cannot exercise discretion "on the basis of suspicion of criminal activity." *United States v. Judge*, 864 F.2d 1144, 1145-46 (5th Cir. 1989). This limit on discretion is "based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4.

To justify an inventory search, the government must demonstrate that standardized procedures exist and that the officers followed them. *United States v. Hope*, 102 F.3d 114, 117 (5th Cir. 1996). Courts have invalidated searches justified as inventory searches where there were no standardized procedures, *see, e.g., Wells*, 495 U.S. at 4 (suppressing evidence because police had no procedure regarding opening closed containers), or where officers failed to testify that they followed such procedures in conducting their search, *see Hope*, 102 F.3d at 116-17.

Noncompliance with the standardized procedures, however, "does not necessarily render the search unreasonable." *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010) (citing *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)). Even when law enforcement fails to conduct a search according to standardized procedures, this does not mandate the suppression of the evidence discovered as a result of the search. *E.g., Mayfield*, 161 F.3d at 1145. "Compliance with procedures merely tends to ensure the intrusion is

limited to carrying out the government's care-taking function. There must be something else; something to suggest the police raised the inventory-search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003) (citation and internal quotation marks omitted). Courts have upheld inventory searches despite noncompliance with applicable standardized procedures. *See, e.g., United States v. Gallo*, 927 F.2d 815, 819-20 (5th Cir. 1991) (declining to suppress where officer began inventory search but, upon opening box, transferred it to another officer and DEA agents to search, and failed to list box's contents); *Mundy*, 621 F.3d at 293-94 (denying suppression despite officer's not completing towing report, where officer stopped searching and called narcotics investigators once he found drugs); *Mayfield*, 161 F.3d at 1145 (affirming denial of motion to suppress where officer conducted proper inventory search but stopped filling out inventory form when he found drugs).

In *Rowland* the officers failed to comply with procedures requiring a listing of all items in the vehicle. *Rowland*, 341 F.3d at 779-80. The court held that this noncompliance was not dispositive, and it examined whether other evidence demonstrated that the inventory search was pretextual. *Id.* at 780. One officer testified that he had only recorded items he considered possible evidence. The court found that this indicated that the search was pretextual because, if the search had actually been for the legitimate purpose of protecting the vehicle owner's property, the officer should have recorded all the property. *Id.* at 781. An officer also testified that the search was partly conducted to investigate whether the

vehicle contained drugs, and the officer called for a drug-sniffing dog to examine the vehicle. *Id.* at 780. The court pointed out that the officers had failed to follow the standardized procedures and that this failure was coupled with evidence indicating that the officers "sifted through the vehicle's contents searching only for and recording only incriminating evidence; something law enforcement may not do." *Id.* at 782.

In contrast with *Rowland*, the Fifth Circuit in *Gallo* affirmed the denial of a motion to suppress evidence despite the officer's failing to record the contents of a container, as required by the applicable procedures. *Gallo*, 927 F.2d at 819-20. In *Gallo* the officer opened a box, observed thin aluminum-foil packets, and, without listing the contents of the box on the inventory sheet, transferred the box to another officer, who drove to the police station and had DEA agents search the box. *Id.* at 819. Despite this noncompliance, the panel upheld the inventory search because the officer had the right to search the box and the DEA agents were acting on his behalf and with his knowledge. *Id.* at 819-20 & n.2.

C

The court holds that the government has established that Officer Trahan found the firearm during a lawful inventory search. Because Shaw was being arrested, and he declined to allow his vehicle to be placed in the custody of another, it was necessary that the vehicle be impounded. Under DPD standard operating procedures, before a vehicle is towed and impounded, "an inventory search will be conducted." D. Mot. Exh. B at 1. The government has demonstrated that DPD's standardized procedures are consistent with protecting the property of the vehicle's owner, protecting the police against claims or disputes over lost or

stolen property, and protecting the police from danger.

The government has also shown that Officer Trahan's failure to strictly comply with DPD inventory-search procedures was not a ruse to discover incriminating evidence. Although these procedures limit DPD officers to one inventory search, when, as here, there is a failure to comply with the procedures, the court considers whether there is additional evidence to suggest that the police are relying on an inventory search rationale to justify an investigatory search for incriminating evidence. Even though Officer Trahan searched Shaw's vehicle after Officer Torres had already done so, when the searches are viewed in context, this departure from DPD's standardized procedures was minimal and does not indicate that Officer Trahan's search was an investigatory search for incriminating evidence.

After Officer Torres initiated an inventory search of Shaw's vehicle, but before he completed the Vehicle Receipt, Officers Trahan and Francis arrived on the scene to provide cover. Officer Trahan offered as a favor to Officer Torres to wait for the wrecker and to complete the inventory sheet while Officer Torres took Shaw to jail. This is a practice in which DPD officers commonly engage and that speeds up the process by enabling the arresting officer to take the arrestee to jail without awaiting the arrival of the wrecker. Officer Trahan conducted an inventory search of Shaw's vehicle because he always takes a second look when he is the officer awaiting the wrecker. This is based on the belief that he will be the one who is in trouble if property is overlooked. In other words, this was not something he opted to do in this case alone or out of a motivation to find incriminating evidence. Officer Trahan did not know whether Officer Torres had performed an inventory

search, and thought he might have interrupted Officer Torres' inventory search. Officer Torres also testified that it is DPD policy for an officer to conduct a second inventory search when that officer is left in charge to handle the impoundment of a vehicle, rather than to rely on the search conducted by another officer. Office Trahan completed the Vehicle Receipt.

Essentially, Officer Trahan conducted an inventory search because he was the officer who was handling the impoundment of Shaw's vehicle and completing the Vehicle Receipt, and he believed he should conduct his own inventory search because he was the impounding officer[9] and was the one who would be in trouble if property was overlooked. He credibly denied that he was searching for incriminating evidence. He was also unsure whether Officer Torres had performed an inventory search, and he thought he might have interrupted Officer Torres' inventory search. Therefore, even if Officer Trahan's search constituted a second inventory search that violated DPD standardized procedures, it was a variance that was rational under the circumstances and that does not evidence that Officer Trahan was actually engaged in a ruse to rummage for incriminating evidence. Under DPD procedures, the impounding officer is responsible for conducting an inventory search, removing valuables and contraband, and properly tagging property and maintaining evidence in its original state. *See* D. Mot. Exh. B at 2. These requirements corroborate that Officer Trahan's decision to search was for inventory, not evidentiary, purposes. And because Officer Torres had not

---

[9]Although DPD procedures state that the Vehicle Receipt must include the "[n]ame and badge number of the *impounding officer*," D. Mot. Exh. B at 3 (emphasis added), Officer Trahan testified credibly that he believed he was supposed to include the *arresting officer's* name and badge number instead.

completed the Vehicle Receipt, Officer Trahan's search of Shaw's vehicle was undertaken as necessary to complete the Vehicle Receipt, which further indicates that his purpose for searching was not to determine whether Officer Torres had overlooked incriminating evidence.

Shaw maintains that Officer Trahan violated DPD procedures by failing to document on the Vehicle Receipt the tablet computer and the firearm that he found. Shaw posits that this failure demonstrates that Officer Trahan's search was a ruse for finding incriminating evidence, because listing all seized property is necessary to fulfill the property-protection purposes of an inventory search. To the extent Shaw attempts to suggest pretext based on the fact that Officer Trahan did not accurately complete the Vehicle Receipt, the court finds that the government met its burden of proving that Officer Trahan was not actually engaged in a ruse to rummage for incriminating evidence.

DPD procedures require the officer who completes the Vehicle Receipt to circle "applicable inventory items and [add] any unusual or notable property items." D. Mot. Exh. B at 3. The Vehicle Receipt includes a list of items that includes "COMPUTER" and "GUN." *Id.* at Exh. A at 1. A tablet computer, the firearm, and clothing were found in Shaw's vehicle. Officer Trahan only circled "CLOTHING" on the Vehicle Receipt. *Id*. Officer Trahan offered credible and unrebutted testimony that his training instructed him to circle only the items that are to be left in the impounded vehicle. He explained that, under his training, valuables and contraband are to be removed from the vehicle, tagged as property, and stored in the DPD property room for safekeeping, thus eliminating the need to

list such items on the Vehicle Receipt.  Moreover, although the Vehicle Receipt can be read to require the impounding officer to list all items found during an inventory search, the DPD procedures do not specifically state that an officer must list items that are removed from the vehicle before impoundment.  And Officer Trahan received training that instructed him to list only the items that remained in the vehicle.[10]

In a case addressing the similarly-worded procedure of another police department, this court held that the officer did not violate the procedure by failing to list a firearm that he had found during an inventory search.  *See United States v. Peterson*, 2011 WL 1485401, at *3-4 (N.D. Tex. Apr. 11, 2011) (Fitzwater, C.J.).  Despite evidence that some officers' personal practice was to list removed items on the inventory sheet, the searching officer's standard practice was not to list removed items.  *Id.* at *4.  This court denied the motion to suppress because there was no evidence that established the searching officer's practice violated police procedure, and because that type of discretion concerning whether to list certain items did not implicate the constitutional dangers inherent in inventory searches.  *Id.*  As this court explained, such discretion "d[id] not enable him to engage in a search for evidence or in

---

[10]Although the court finds to be true Officer Trahan's credible and unrebutted testimony about his training, such training appears to be at odds with certain DPD procedures and the Vehicle Receipt.  Officer Trahan's training instructed him to remove all valuables and contraband, and to circle on the receipt only the items that would remain in the impounded vehicle.  But the Vehicle Receipt lists items such as "GUN," "COMPUTER," "GOLF CLUBS," "MONEY," and "PURSE"—items that, according to DPD procedures, officers must remove.  *See* D. Mot. Exh. A at 1; *id.* at Exh. B at 2 (DPD procedures stating that "Money ($5.00 or more), drugs, firearms, and high-dollar valuables will not be left in the impounded vehicle.  The impounding officer will remove the items and will place them at the Property Unit[.]").

general rummaging under the guise of conducting an inventory search." *Id.* Similarly in Shaw's case, Officer Trahan's practice of not listing removed items does not expand his discretion to search. Shaw relies on Officer Trahan's failure to list the firearm and tablet computer as evidence that Officer Trahan was not actually conducting an inventory search. But this evidence does not support this conclusion, because Officer Trahan complied with his training regarding inventorying and completing the Vehicle Receipt. There is no evidence that Officer Trahan acted in a way that was different from how he had been trained. *Cf. Rowland*, 341 F.3d at 780 (holding that motion to suppress should have been granted where officer only recorded items that he considered evidence).

\* \* \*

For the reasons explained, Shaw's motion to suppress is denied.

**SO ORDERED**.

January 7, 2013.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE